UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CAESAR ROSS,<br><br>        Defendant. | Criminal No. 24-cr-10136-FDS |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Over the course of three summer months in 2020, in the midst of the global pandemic, in at least four separate transactions, defendant Caesar Ross obtained 23 firearms with obliterated serial numbers from an individual in Florida. Ross provided that individual with fentanyl in exchange for the firearms, which Ross explicitly asked the serial numbers to be obliterated from, and which he and his associates then distributed to individuals who could not lawfully possess them in Massachusetts. Ross also connected the individual with an individual he introduced as his "cousin," a felon, who over the next two months obtained an additional 6 firearms for distribution in the same manner. Ross did so notwithstanding the fact that Ross also was a felon who could not lawfully possess firearms. At least five of these firearms have been recovered so far in and around Boston, in the hands of felons and gang members, and at the scenes of a shots-fired incident and an armed assault; the remainder are believed to remain at-large.

In 2023, after the individual in Florida (hereafter, "CW-1") began cooperating with law enforcement, CW-1 contacted Ross and proposed another such transaction. Ross promptly agreed, and on September 5, 2023, Ross provided CW-1 with nearly 60 grams of fentanyl in

exchange for four firearms.

For the defendant's actions, he was charged with and pleaded guilty to one count of firearms trafficking and one count of distribution of and possession with intent to distribute fentanyl. The government respectfully requests that this Court impose a 102-month sentence of imprisonment, along with three years of supervised release and the mandatory special assessment of $200. This recommended sentence represents almost 3.5 times the length of the longest sentence the defendant has previously received. Although it represents a downward variance from the Guideline Sentencing Range, the variance is warranted both to reflect the fact that the defendant had taken steps to turn his life around and away from the criminal lifestyle he had been engaged in during 2020 and previously, before making the poor decision that led to his arrest here, and to reflect his efforts at rehabilitation since his arrest.

## FACTS

The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 9 through 34 of the Presentence Investigation Report ("PSR").[1]

### The 2020 Firearms Trafficking Relevant Conduct

On May 15, 2020, CW-1 purchased eleven firearms from a Federal Firearms Licensee ("FFL") in Florida. From May 15 through May 16, 2020, CW-1 traveled from Florida to Boston. CW-1 met up with Ross in Boston, provided him the firearms in exchange for fentanyl, and then traveled back to Florida on the same date. One of the firearms CW-1 distributed to Ross during

---

[1] The government below also notes the recovery of a fifth firearm that the government learned about after the Final Disclosure of the PSR had been issued in December 2024. Upon learning of this additional recovery, the government promptly gave notice to Probation and defense counsel on April 10, 2025. The government understands that Probation might be issuing an addendum to the PSR to reflect these additional facts.

this trip was recovered in Massachusetts on April 3, 2021, in the possession of two individuals, one of whom was a felon. Another of these firearms was recovered on the ground in Boston on July 4, 2024, after an incident in which three males shot bullets into a home in which numerous residents were present, two sleeping. PSR ¶¶ 11, 13.

On June 19, 2020, CW-1 purchased four firearms from a FFL in Florida. From June 19 through June 20, 2020, CW-1 traveled from Florida to Boston. CW-1 met up with Ross on June 20, 2020 in Boston, provided him the firearms in exchange for fentanyl, and then traveled back to Florida on the same date. One of these firearms was recovered in Massachusetts just four days later, in the possession of a felon. PSR ¶¶ 11, 14.

On July 6, 2020, CW-1 purchased four firearms from a FFL in Florida. From July 9 through July 10, 2020, CW-1 traveled from Florida to Boston. On July 10, 2020, CW-1 met up with Ross in Boston, provided him the firearms in exchange for fentanyl, and then traveled back to Florida that same night. One of the firearms CW-1 distributed to Ross during this trip was recovered in Massachusetts on August 29, 2024, in the possession of a felon in connection with an armed assault. PSR ¶¶ 11, 15.

On August 1, 2020, records demonstrate that CW-1 purchased four firearms from a FFL in Florida. On August 9, 2020, CW-1 traveled from Florida to Boston. CW-1 met up with Ross in Boston, provided him the firearms in exchange for fentanyl, and then traveled back to Florida. One of the firearms CW-1 distributed to Ross during this trip was recovered in Massachusetts on May 26, 2022, in the possession of an individual who could not lawfully possess a firearm. PSR ¶¶ 11, 16.

On September 12, 2020, CW-1 purchased three firearms from a FFL in Florida. On September 13, 2020, CW-1 traveled from Florida to Boston. CW-1 met up with Ross's cousin in

or around Boston and provided him the firearms in exchange for fentanyl. On September 14, 2020, CW-1 traveled back to Florida. PSR ¶¶ 11, 17.

On October 9, 2020, CW-1 purchased three firearms from a FFL in Florida. On October 9, 2020, CW-1 traveled from Florida to Boston, arriving on October 10. CW-1 met up with Ross's cousin in Boston on October 10 and provided him the firearms in exchange for fentanyl. That same day, CW-1 traveled back to Florida, arriving on October 11. PSR ¶¶ 11, 18.

At least five of the firearms that CW-1 transported into Massachusetts between May and October 2020 have been recovered in Massachusetts and have been confirmed to meet the definition of firearms under federal law:

- On April 3, 2021, Massachusetts State Police in Boston, MA, recovered a Smith & Wesson, model M&P 9 Shield, 9mm pistol, with an obliterated serial number from two individuals, one of whom was a felon and considered a member of the Wilcock street gang by the Boston Regional Intelligence Center. The serial number on the M&P Shield firearm was eventually restored and determined to be serial number JFL8850. ATF traced the firearm and learned it had been purchased by CW-1 at a FFL in Florida on May 15, 2020.

- On June 24, 2020, Boston Police Department and METROLEC SWAT recovered a Smith & Wesson pistol, model MP Bodyguard, 380 ACP, with an obliterated serial number, from a convicted felon in Braintree, Massachusetts. The serial number was later restored and determined to be serial number KHM6440. An ATF trace of the MP Bodyguard firearm revealed that it had been purchased by CW-1 at a FFL in Florida on June 19, 2020, just five days prior to its recovery.

- On May 26, 2022, members of the Worcester Police Vice Squad recovered a Smith & Wesson, M&P Shield, 9mm, semi-automatic pistol with an obliterated serial number in Worcester, MA, from an individual who has not permitted to possess a firearm and was accordingly arrested on firearm and drug charges. The firearm was taken to the Massachusetts State Police Lab to restore the serial number. In October 2022, the firearm's serial number was restored to JEU9799. An ATF trace of the firearm revealed that it had been purchased by CW-1 on August 1, 2020.

- On July 4, 2024, around 2:44 a.m., members of Boston Police recovered a Springfield XDSG .45 caliber semi-automatic pistol with an obliterated serial number, loaded with one round in the chamber and five rounds in the magazine, off the ground in Boston, along with other ballistic evidence. Officers were responding to a ShotSpotter activation just north of Franklin Park Zoo. A neighborhood resident told police that bullets had entered his home, and police responded and observed multiple bullet holes in the home.

> The resident had been home, along with his four teenage or young adult children, two of whom had been sleeping at the time. The serial number was restored and determined to be HG140629. ATF traced the firearm and learned it had been purchased by CW-1 at a FFL in Florida on May 15, 2020.
>
> - On August 29, 2024, around 8:33 a.m., members of Boston Police recovered a Smith & Wesson .380 ACP Bodyguard pistol with an obliterated serial number, loaded with one round in the chamber and six rounds in the magazine, located inside a backpack of a suspect in an armed assault in Roxbury. Officers were responding to a call for help, where two males had allegedly jumped a victim and one had pulled a gun on him. When officers located a suspect matching the description (and later determined to be a felon), they pat-frisked him and located a gun in his bag. The serial number was restored and determined to be KHL7963. ATF traced the firearm and learned it had been purchased by CW-1 at a FFL in Florida on July 6, 2020.

PSR ¶¶ 19-23.

Ross tried to contact CW-1 on November 4, 2022, but CW-1 had blocked Ross's number at that point because CW-1 had achieved and wished to maintain sobriety. PSR ¶ 24. In 2023, CW-1 agreed to plead guilty to making false statements to a firearms dealer in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), and signed a cooperation agreement with the government. PSR ¶ 25.

**The 2023 Gun/Drug Trafficking Offense Conduct**

After entering into the cooperation agreement, in August 2023, CW-1 agreed to conduct a controlled purchase of fentanyl from Caesar Ross, in which CW-1 would agree to provide Ross with firearms in exchange for Ross providing him with fentanyl. CW-1 set up the purchase from Ross in a series of calls and text messages. Over the course of those communications, the two agreed that CW-1 would provide Ross with 4 firearms, and Ross would provide CW-1 with 60 grams of fentanyl. They agreed to meet at 3:30 pm., on September 5, 2023, at a location in Quincy, Massachusetts, to complete the transaction. PSR ¶¶ 26-27.

On the afternoon of September 5, 2023, agents equipped CW-1 with covert electronic recording and transmitting equipment that was being simultaneously monitored by agents and

provided CW-1 with four real firearms with obliterated serial numbers, which were to be used to make the fentanyl purchase; as a safety measure, the firearms had been rendered inoperable. While under law enforcement surveillance, CW-1 drove to the agreed upon location in a residential neighborhood in Quincy. Ross arrived and sat in the passenger seat of CW-1's vehicle. CW-1 took the firearms out of a maroon bag, unwrapped them, and showed them to Ross. CW-1 and Ross then both re-wrapped the firearms, and CW-1 placed them back in the bag and handed Ross the bag containing the firearms. Ross held the bag on his lap. Ross handed a bag containing two large knots of a tan/white powder to CW-1. PSR ¶¶ 28-30.

When CW-1 exited the driver's seat, pretending to retrieve ammunition from the back seat, Ross opened the passenger door and exited the passenger's seat, holding the bag containing the firearms and starting to take it with him. Thereafter, agents drove up and announced themselves. Ross threw down the bag and fled on foot. After a brief chase, Ross was arrested. Agents took custody of the firearms that Ross had dropped as well as the bag of drugs that he had given CW-1. The bag of drugs was tested at the DEA Northeast Lab and determined to contain a mixture, weighing 59.18 grams, and containing fentanyl. PSR ¶¶ 31-32.

An ATF interstate nexus expert determined that the four firearms were all real firearms manufactured by Beretta, Glock, and FN Herstal – a Beretta 92F, 9mm pistol; a Beretta Elite IA 9mm pistol; a Glock 22, .40 caliber pistol; and a FN Herstal 5.7, 5.7x28mm pistol – and that all of them had been manufactured outside of Massachusetts, and thus had traveled in and affecting interstate commerce prior to being recovered in Quincy on September 5, 2023. PSR ¶ 33.

Ross knew that his receipt of these firearms was a felony. Specifically, he knew that, as a felon, he was prohibited from possessing firearms. For example in 2013, Ross had been convicted in the Suffolk Superior Court for Distribution and Possession of Cocaine, which is

punishable under Massachusetts law by imprisonment for more than one year; Ross was sentenced to 2.5 years and one day in prison. PSR ¶ 34.

## DISCUSSION

### I. Sentencing Guideline Calculation

Probation has calculated defendant's total offense level as 31; the government agrees with this calculation, which comports with the parties' calculation in the plea agreement. Dkt. No. 22 ¶ 4. Probation has calculated the defendant's criminal history category as VI; the government agrees with this calculation.[2] Based on its calculations of a total offense level of 31 and criminal history category as VI, Probation has calculated a guideline sentencing range ("GSR") in this case to include a term of incarceration from 188 to 235 months, to be followed by a term of supervised release of three years, a fine of between $30,000 and $1 million if he is able to pay it, and a special assessment of $200. PSR at 35. The government agrees with this calculation.

### II. Plea Agreement

The parties entered into a "C" plea agreement, in which the defendant agreed to plead guilty to Counts One and Two of the Information, and the parties agreed to a sentence within the range of 90 to 120 months in prison followed by a term of three years of supervised release, as well as the $200 special assessment. Dkt. No. 22.

### III. Application of the Section 3553(a) Factors

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of

---

[2] The government agrees that the defendant is in CHC VI but believes that the conviction listed in paragraph 60 does not score and has raised this with Probation. Whether that conviction scores has no impact on the defendant's criminal history category, however.

7

sentencing set forth in § 3553(a)(2). These factors include: the nature and circumstances of the offenses and the history and characteristics of the defendant; the need for the sentence imposed to satisfy the statutory purposes of sentencing; the kinds of sentences available; the applicable guidelines; pertinent Sentencing Commission policy statements; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution. In this case, these factors point to a sentence of imprisonment of 102 months and three years of supervised release.

    A. **Nature and Circumstances of the Offense; Need for Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence, and Protect the Public**

The nature of the offense is quite serious. Ross has pleaded guilty to one count of firearms trafficking and one count of distribution of and possession with intent to distribute fentanyl.

In 2020, Ross and his cousin obtained no fewer than twenty-nine firearms that had been straw purchased in Florida and transported to Massachusetts. Because of the conduct by the defendant and his associates, dozens of firearms have been illegally distributed on the streets of Boston and surrounding communities. At least five of the firearms purchased by CW-1 in Florida in 2020 and then provided to Ross and/or his cousin in exchange for fentanyl have been recovered in and around Boston. PSR ¶ 19. One of these firearms was found at the scene of a shots-fired incident near the Franklin Park Zoo, with one round in the chamber and five rounds in the magazine; bullets had entered the home of a man and his four children, two of whom had been sleeping at the time. PSR ¶ 23. Another of these firearms was found with one round in the chamber and six rounds in the magazine, in the backpack of a felon who was the suspect in an armed assault in Roxbury; he was one of two males who had allegedly jumped the victim and

pulled a gun on him. At least three of the individuals from whom the firearms that Ross purchased were covered were felons. PSR ¶¶ 20-21. At least one was also considered by the Boston Police to be a member of a street gang in Boston. PSR ¶ 20. And, had CW-1 not been working with law enforcement, another four illegal firearms would have made their way to the streets in and around Boston in 2023.

The scourge of gun violence in Boston is well-documented. Between January 1 and December 31, 2020 (the year in which Ross purchased the guns from CW-1 and distributed them in and around Boston), Boston recorded 44 fatal shootings and 231 non-fatal shootings.[3] The people hurt and killed in these shootings include people who voluntarily engage in criminal conduct in the city as well as innocent bystanders caught in the middle – such as the family whose apartment was shot up while children slept inside – and the harm from these shootings extends to the entire community that loses its sense of safety.

Most gang-related murders and felonies involve illegal guns, according to federal crime data.[4] Illegal guns circulating among high-risk networks present a threat to the security and well-being of urban neighborhoods. The supply of illegal guns to those embedded in high-risk networks is a critical mechanism in shaping rates of deadly violence in American cities.[5] Moreover, when an individual is victimized by or exposed to gun violence, it increases the

---

[3] *See* https://data.boston.gov/dataset/shootings/resource/73c7e069-701f-4910-986d-b950f46c91a1 (last accessed July 24, 2025).

[4] Gun Violence in America, NATIONAL INSTITUTE OF JUSTICE, (February 26, 2019), available at: https://nij.ojp.gov/topics/articles/gun-violence-america (last accessed July 25, 2025).

[5] 4 David M. Hureau & Anthony A. Braga, The Trade in Tools: The Market for Illicit Guns in High-Risk Networks, CRIMINOLOGY, volume 56 issue 3, (July 18, 2018), available at: https://onlinelibrary.wiley.com/doi/full/10.1111/1745-9125.12187 (last accessed July 25, 2025).

likelihood that they will be victimized again or resort to gun violence themselves.[6] Any sentence in a case such as this must take into account the harms that the proliferation of illegal firearms and their delivery to individuals not permitted to possess them causes to the community, and the danger that the 24 unrecovered firearms[7] from the relevant conduct here pose to the community right now.

Moreover, Ross provided CW-1 with fentanyl in exchange for these firearms, both in 2020 and again in 2023. In 2023, Ross traded approximately 60 grams of fentanyl for 4 firearms. Ross had done the same thing on at least four occasions in 2020, to obtain an additional 23 firearms; assuming a similar "price" of 15 grams of fentanyl per firearm in 2020,[8] Ross would have distributed around 345g of fentanyl to CW-1 in 2020, for a total of over 400 grams. This is a significant amount of fentanyl, especially when one considers that 2mg of fentanyl can be a fatal dose (www.dea.gov/onepill). Fentanyl is a deadly drug that has wreaked havoc in Massachusetts and beyond over the past several years. "Fentanyl is the deadliest drug threat the United States has ever faced, killing nearly 38,000 Americans in the first six months of 2023 alone. Fentanyl

---

[6] A Nation of Survivors: The Toll of Gun Violence in America, EVERYTOWN FOR GUN SAFETY, (Updated February 3, 2022), available at:
https://everytownresearch.org/reports/nationofsurvivors/ (last accessed July 25, 2025).

[7] Only five of the 29 firearms that Ross and his cousin purchased from CW-1 in 2020 are known to have been recovered so far. It is possible that more of these firearms have been recovered but their serial numbers have not yet been restored, making it impossible to identify them. The four disabled firearms that CW-1 sold to Ross in 2023 were recovered at the scene of the operation that day.

[8] The government does not know the specific "price" Ross charged CW-1 in 2020; in one of the calls in 2023, where CW-1 asked to do the "same as before," Ross told CW-1 that "the numbers changed some" before indicating through coded language that he would now exchange 50-60 grams of fentanyl for four firearms. Complaint Affidavit, Dkt. No. 1-1 ¶ 13.

and other synthetic drugs . . . are responsible for nearly all of the fatal drug overdoses and poisonings in our country."[9] These grim statistics are not hypothetical – they describe the opioid overdose crisis occurring right now in this country and in this district. And although fentanyl can be deadly, even when it is not lethal, its effects can devastate the lives of those who abuse it and their families. The epidemic is real and being felt every day by families across Massachusetts and New England. Although here the fentanyl was being dealt directly to CW-1 for CW-1's personal use, so its most direct harm was felt by CW-1 and CW-1's family and not the wider community, drug dealing is an inherently dangerous activity, with risks and harms at every stage from production to transport to distribution to ingestion. Moreover, the provision of drugs to CW-1 perpetuated CW-1's poor decision-making, straw purchasing dozens of firearms, obliterating their serial numbers, and delivering them to Ross and his cousin to be distributed on the streets.

A significant sentence of incarceration is the necessary and appropriate sentence in this case to reflect the seriousness of these offenses, to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and especially others from offending in the same way again, and to protect the public. The government's recommended sentence of 102 months represents nearly 3.5 times the length of Ross's lengthiest sentence to date and will operate as a significant punishment and deterrent to him and others from ever engaging in such conduct again.

B. **The History and Characteristics of the Defendant**

The government acknowledges certain sympathetic points that are reflected in the PSR, including the fact that he experienced a turbulent childhood, living in poverty with a mother with

---

[9] U.S. Department of Justice Drug Enforcement Administration, *2024 National Drug Threat Assessment*, available at https://www.dea.gov/documents/2024/2024-05/2024-05-24/national-drug-threat-assessment-2024, at 1 (last visited July 25, 2025).

11

chronic substance use issues and her abusive boyfriend, and later in foster care and DYS custody, with only a brief peaceful period living with his maternal grandmother. *See* PSR ¶¶ 87-90. As a result, he suffered PTSD and other mental health and substance use issues. PSR ¶¶ 107-108, 113-117. The government likewise acknowledges that Ross did not commit any new crimes between the time the relevant conduct ended in October 2020 and the time he was contacted by CW-1 in August 2023, and that he had made positive changes in his life during that time period including maintaining a long-term relationship with a woman and helping her raise her children (PSR ¶ 100), enrolling in a union apprenticeship program to become an electrician (PSR ¶ 121), and maintaining employment at a restaurant, working his way up to store manager (PSR ¶ 125).

The government also acknowledges that the defendant has made some positive choices while in pretrial detention, including participating in programming, including restorative justice programming. PSR ¶ 122. The government has considered these factors in recommending an appropriate sentence.

However, the government must also consider other, less sympathetic factors, including the defendant's prior record. The defendant, now 41 years old, has been court-involved since the age of 15. PSR ¶ 55. His scoring convictions include multiple convictions for distribution and possession with intent to distribute class A and/or B substances ( PSR ¶¶ 60-62, 65-67) as well as unlawful possession of ammunition (PSR ¶ 63), resulting in Criminal History Category VI; [10] the

---

[10] The government does not believe that the conviction in PSR ¶ 60 should score and has raised this issue with Probation; regardless, it does not impact the CHC. The government acknowledges that the defendant's criminal history category of VI includes scoring convictions from 2005, over 20 years ago, for conduct when he was 18 or 19 years old. If those convictions were excluded and his CHC were instead V, his GSR would be 168-210 months.

longest sentence he served that remains on his record was a 2.5-year sentence for a 2013 drug offense committed at age 27. PSR ¶ 62. The government must also consider his role here in unlawfully bringing firearms into Massachusetts and funneling them into the hands of individuals who could not legally possess them and, at least in a couple of known occasions, engaged in violent crime with them. The whereabouts of at least 18 of these firearms Ross personally obtained from CW-1 are still unknown, and thus the harm from these very serious crimes is ongoing. Moreover, although Ross did not initiate the plan for the drug/gun trade in 2023, he enthusiastically agreed to participate when CW-1 proposed it; had CW-1 not been a cooperator, four more illegal guns would have made their way into the streets.

In light of all of these factors, a sentence of 102 months of imprisonment, with three years of supervised release, is sufficient, but not greater than necessary, to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553(a). The term of supervised release, with the standard and special conditions recommended by Probation, will provide invaluable support for the defendant as he continues his rehabilitative work and returns to the more positive path he had been on prior to his arrest in this matter. The government likewise supports Probation's recommendation that the defendant participate in RDAP. PSR ¶ 119.

### C. Avoiding Unwarranted Sentencing Disparities

JSIN data indicate that during the last five fiscal years, there were 383 defendants whose primary guideline was § 2K2.1, with a final offense level of 31 and a Criminal History Category of VI, after excluding defendants who received a § 5K1.1 departure. The average length of imprisonment imposed was 174 months, and the median was 180 months. PSR ¶ 151.

The government's recommended sentence of 102 months, while lower than the JSIN data average, is proportionate to the sentences received by defendants in similar types of cases in this

District.  For example, in *United States v. Lebberes*, 23-cr-10046-PBS (D. Mass.), the defendant distributed significant quantities of methamphetamine and counterfeit Xanax to a cooperating witness, and subsequently also sold the CW a ghost gun and ammunition and a machinegun. When law enforcement executed a search warrant at the defendant's home, they recovered more than 25 firearms and two 3-D printers. 23-cr-10046-PBS, Dkt. No. 63 at 1-7.   He was sentenced to 121 months in prison. While the defendant in that case did not have prior criminal history, given the similarity of the conduct, it is a useful comparator.

In *United States v. Roache*, 24-cr-10001-LTS (D. Mass.), the defendant, age 30, in Criminal History Category IV, conspired with a co-defendant to bring more than 24 illegal firearms into Massachusetts from South Carolina; eleven of these firearms were recovered in Massachusetts after being used in a crime, including one firearm recovered from the scene of a shooting in Boston just 15 days after it had been purchased in South Carolina.  *See* 24-cr-10001-LTS, Dkt. Nos. 63-64.  There was also evidence he was involved in cocaine distribution.  He was sentenced to 57 months in prison.

In *United States v. Pringle et al.*, 22-cr-10157-FDS (D. Mass.), this Court sentenced individuals involved in a scheme that brought approximately two dozen firearms from Alabama into Massachusetts and into the hands of felons and gang members as follows:

- Jahquel Pringle, 42 months (Pringle was a felon and the leader of the local conspiracy);
- Kobe Smith, 21 months (Smith was 20 years old and had no prior criminal history); and
- Jarmori Brown, 18 months (Brown was 18 years old and a lower-level member of the conspiracy; he also faced a significant state sentence).

All three of these defendants were in significantly lower criminal history categories and had much lower GSRs than Ross, justifying the more significant sentence recommended for Ross.

In *United States v. John Pierre*, 22-cr-10106-MLW (D. Mass.), the defendant, age 26, was involved in the trafficking of at least 30 firearms from Tennessee into Massachusetts.  He

was sentenced to 24 months in prison. He had no criminal history; Ross's significant criminal history justifies the much more significant sentence.

A sentence of 102 months thus is reasonably in line with the broad range of sentences received by defendants in this district for similar conduct, after taking into account the differences in age, criminal history, and other characteristics unique to each defendant and case. Accordingly, the government's recommendation of 102 months, while lower than the JSIN data, is proportionate to sentences for similarly situated defendants in the District, and thus consistent with the § 3553(a) goal of avoiding unwarranted sentencing disparities with similarly situated defendants.

## CONCLUSION

For the foregoing reasons, and those to be articulated at the sentencing hearing, the government respectfully recommends that this Court impose a sentence of 102 months imprisonment, to be followed by a term of supervised release of three years; and the mandatory special assessment of $200. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

July 25, 2025

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                            */s/ Elianna J. Nuzum*
                                                           Elianna J. Nuzum
                                                           Assistant U.S. Attorney

July 25, 2025